IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


DALE MAXIMILIANO ROLLER,
aka DALE MAXIMILIANO
ROLLER RAMIREZ, an individual,

        Plaintiff,

    v.

ALFREDO NUNEZ HERRERA, an
individual; and CHURCHILL
LEONARD, P.C., aka CHURCHILL
LEONARD LAWYERS, an Oregon
Professional Corporation,

        Defendants.

Case No. 3:18-cv-00057-JR

OPINION AND ORDER

_____

RUSSO, Magistrate Judge:

        Pro se plaintiff Dale Roller brings this real property suit against defendants Alfredo Herrera and Churchill Leonard, P.C. ("Churchill"). All parties consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). Defendants each move for summary judgment[1] pursuant to Fed. R. Civ. P. 56. Oral argument was held on September 13, 2019. For the reasons set forth below, defendants' motions are granted.

---

[1] Defendants' motions are substantively similar such that the Court addresses them together unless otherwise indicated.

## BACKGROUND

On October 15, 2012, Herrera purchased property located at 462 B Street in Independence, Oregon ("Property"). First Herrera Decl. ¶ 2 & Ex. 1 (doc. 70). At that time, plaintiff, a licensed attorney, had been living at the Property for several years pursuant to a rental agreement with the prior owners. First Lis Decl. Ex. 1, at 23, 26 (doc. 71).

On June 3, 2013, plaintiff and Herrera entered into a Real Property Purchase Agreement ("Agreement"), through which Herrera sold the Property to plaintiff for $50,000.[2] First Am. Compl. ("FAC") ¶ 9 & Ex. 4 (doc. 9). The Agreement required plaintiff to make a $2,000 down payment and thereafter provide a minimum of $6,000 by June 3rd each year until the balance of the purchase price was paid in full. FAC Ex. 4, at 1 (doc. 9). The Agreement also required plaintiff to pay annual property taxes. Id. at 2. Further, plaintiff was obligated, "at his sole expense," to "keep and maintain" the Property and "comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation" of the Property. Id. at 1-2. In the event the Property was "destroyed or rendered wholly inhabitable by fire, storm, earthquake, or other casualty not caused by the negligence of Buyer," the Agreement remained in place. Id.

---

[2] Herrera contends that plaintiff was representing him during this transaction. First Herrera Decl. ¶ 3 (doc. 70). Although plaintiff refutes Herrera's assertion, he admits to drafting the Agreement and preparing and filing all relevant documents. First Lis Decl. Ex. 1, at 28, 37 (doc. 71). Plaintiff also maintains, in other portions of his opposition, that "[t]here is evidence of [an] attorney-client" relationship. Pl.'s Resp. to Herrera's Mot. Summ. J. 12 (doc. 75); see also Hearing (Sept. 13, 2019) (plaintiff stating at oral argument that he and Herrera "consulted" regarding Herrera's divorce). Herrera is not, and has never been, an attorney, licensed or otherwise. Second Herrera Decl. ¶ 5 (doc. 80).

Herrera had the right to terminate the Agreement if plaintiff failed to cure any material breach (other than for nonpayment) within thirty days of delivery of notice.[3] Id. at 3. If plaintiff failed to make a payment within sixty days of when it became due, Herrera likewise had the right to terminate the Agreement or "declare the entire balance of payments payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available . . . at law or in equity." Id.

On May 11, 2017, an electrical fire severely damaged structures on the Property. FAC ¶ 13 (doc. 9). Plaintiff thereafter did not remit the entire $6,000 payment due under the Agreement by June 3, 2017, nor did he pay the 2016 or 2017 property taxes. First Herrera Decl. Exs. 2-3 (doc. 70); First Lis Decl. Ex. 1, at 42, 71-72 (doc. 71); First Lis Decl. Ex. 22, at 6 (doc. 71).

On July 20, 2017, the City of Independence mailed a Violation Notice to Herrera instructing that the Property was unsafe and in violation of several maintenance codes, and therefore needed to be vacated and demolished by August 25, 2017, due to the fire. FAC Ex. 6 (doc. 9). As record owner of the Property, Herrera was responsible for remedying the code violations; however, under the Agreement, he did not have a right to possession or any duty to maintain the Property in a safe and habitable condition. FAC Ex. 4 (doc. 9).

Accordingly, on July 30, 2017, Herrera provided the Violation Notice to plaintiff via text message and sought his cooperation in remedying the issues raised therein. FAC ¶ 16 (doc. 9). On July 31, 2017, after receiving no response, Herrera asked plaintiff to remove his personal items from the structures on the Property so that Herrera could have them demolished. First Herrera

---

[3] The Agreement specifically referenced and required one notice: the aforementioned notice related to default. See generally FAC Ex. 4 (doc. 9). The only other provision concerning notice stated: "Any notice required or permitted under [the] Agreement or under state law" was "deemed sufficiently given or served" if sent by certified mail, return receipt requested. Id. at 3.

Decl. ¶ 13 & Exs. 2-3 (doc. 70). Plaintiff replied that he would try to remove his personal property within the next couple weeks. Id.

As an alternative to fixing the code violations himself, Herrera sought to deed the Property to plaintiff so that plaintiff would be the record owner. First Herrera Decl. ¶ 7 (doc. 70). On August 1, 2017, Herrera requested through text message that plaintiff provide a deed form to effectuate the transfer. First Herrera Decl. Ex. 2 (doc. 70). Plaintiff replied in the affirmative but never provided the deed or otherwise followed up about this transfer. First Herrera Decl. ¶ 7 (doc. 70); First Lis Decl. Ex. 1, at 59-60 (doc. 71).

On August 30, 2017, plaintiff was disbarred by order of the Oregon Supreme Court. First Lis Decl. Ex. 2 (doc. 71).

Herrera regularly contacted plaintiff through early September 2017 in an effort to remedy the code violations. First Herrera Decl. ¶ 8 (doc. 70). Plaintiff refused to take any remedial action, despite acknowledging that, under the Agreement, "Herrera was no longer a landlord and therefore no longer responsible for any repairs that needed to be made on the property." First Lis Decl. Ex. 1, at 35-36, 60 (doc. 71); First Lis Decl. Ex. 14, at 11-12 (doc. 71).

After Herrera's efforts to obtain plaintiff's cooperation failed, Herrera hired Churchill to represent him in connection with complying with the Violation Notice. On September 14, 2017, Churchill posted a Notice to Vacate on plaintiff's door, which explained:

> Your continued possession of the property in violation of Independence Municipal Code 6196 is outrageous in the extreme due to the location of the school in the immediate vicinity. You are actively preventing securing the property which presents an extreme danger to the safety of the community.

First Lis Decl. Ex. 10 (doc. 71). The Notice to Vacate further informed plaintiff that, if necessary, Herrera intended to take possession of the Property pursuant to Or. Rev. Stat. § 105.105 through

Or. Rev. Stat. § 105.168, and provided contact information for Herrera's attorney, Jill Foster, who worked for defendant Churchill. Id.

Also on September 14, 2017, Churchill posted on plaintiff's door and sent, via certified mail, a Notice of Default and Forfeiture. First Lis Decl. Ex. 11 (doc. 71). This notice detailed plaintiff's material breaches of the Agreement, including failure to: (1) pay property taxes "due on or before November 15, 2016 in the amount of $1,101.49"; (2) "make the payment due on or before June 3, 2017 in an amount of not less than $6,000"; and (3) comply with city code and maintain the Property following the May 2017 fire. Id. at 1. The notice apprised plaintiff that "the entire balance of payments payable hereunder" – i.e., "$27,101.49"[4] – was "immediately due and payable" and that, if plaintiff "fail[ed] to cure the defaults outlined above, [his] interest in the Contract of Sale and the property [will be forfeited] on December 13, 2017." Id. at 2.

Plaintiff thereafter did not contact Foster or Herrera to discuss the notices or the errors he purportedly believed were included therein, nor did he vacate the Property or tender any additional payments. First Lis Decl. Ex. 1, at 60-68, 73-77 (doc. 71).

On October 18, 2017, Herrera filed a forcible entry and detainer action against plaintiff in Polk County Circuit Court to regain possession of the Property and comply with the Violation Notice ("Polk County Lawsuit I"). First Herrera Decl. ¶¶ 9-10 (doc. 70). On October 31, 2017, plaintiff moved for judgment on the pleadings in Polk County Lawsuit I. FAC Ex. 11 (doc. 9). The following day, plaintiff issued document requests in Polk County Lawsuit I, three of those requests sought information related to amounts owed for the Property. FAC Ex. 13 (doc. 9). Before

---

[4] Defendants now admit that plaintiff "actually owed $21,106.39 to Herrera as of September 14, 2017, not $27,101.49 as stated in the Default Notice." Herrera's Mot. Summ. J. 11 (doc. 68). On November 15, 2017, Herrera paid an additional $1,049.05 for property taxes, bringing the total amount owed under the Agreement to $22,155.44. First Lis Decl. Ex. 12 (doc. 71).

Herrera's responses were due, the Polk County Circuit Court granted plaintiff's motion on the grounds that no landlord-tenant relationship existed. First Lis Decl. Ex. 13 (doc. 71).

On November 17, 2017, Herrera filed a second action against plaintiff in Polk County Circuit Court to recover the Property, enjoin plaintiff from residing there, and require plaintiff to remedy the code violations and pay amounts owed under the Agreement. ("Polk County Lawsuit II"). FAC Ex. 15 (doc. 9). On November 27, 2017, the Polk County Circuit Court held a TRO hearing, during which plaintiff testified that he was entitled to 120 days of notice to cure his defaults before he could be required to vacate the property, as opposed to the 90 days of notice Herrera provided. First Lis Decl. Ex. 3, at 26 (doc. 71). However, plaintiff admitted that he did not pay the amount due and owing under the Agreement as of June 3, 2017, or the 2016 or 2017 property taxes. Id. at 21. Plaintiff indicated that he paid Herrera $30,000 of the Property's $50,000 purchase price, such that Herrera was seeking to recover more than was owed. Id. at 26.

On December 11, 2017, plaintiff filed a Notice of Claim of Right pursuant to Or. Rev. Stat. § 93.915(5). First Foster Decl. ¶ 15 & Ex. 2 (doc. 69). This notice asserted a longer period of time for plaintiff to cure his default and requested proof of the amount owing. First Foster Decl. Ex. 2 (doc. 69).[5]

On December 12, 2017, plaintiff provided Herrera with a cashier's check in the amount of $27,101.49 and demanded that the Property be deeded to his father. First Foster Decl. Ex. 6 (doc. 69); First Lis Decl. Ex. 1, at 87 (doc. 71); First Lis Decl. Ex. 4, at 23, 25 (doc. 71); First Lis Decl. Ex. 5 (doc. 71). Herrera voluntarily dismissed Polk County Lawsuit II on the day after he received payment. First Lis Decl. Ex. 28 (doc. 71).

---

[5] Herrera never received a copy of the Notice of Claim of Right and Foster was unaware of its existence until after this lawsuit was filed. First Foster Decl. ¶ 15 (doc. 69); First Herrera Decl. ¶ 11 (doc. 70).

On January 10, 2018, plaintiff commenced this lawsuit premised on the fact that, as of September 2017, he only owed "Herrera a total of $21,106.39 towards the home inclusive of 2016 property taxes." FAC ¶ 20 (doc. 9). Plaintiff filed an Amended Complaint on January 31, 2018, alleging claims for: (1) violation of the Fair Debt Collection Practices Act ("FDCPA") against Churchill; (2) abuse of process against all defendants; (3) violation of Oregon's Unfair Trade Practices Act ("UTPA) against Churchill; (4) fraud against all defendants; and (5) tortious breach of the implied duty of good faith and fair dealing against Herrera. Plaintiff seeks emotional distress damages, statutory damages, and $152,000 for the fair market value of the Property, along with recoupment of the entire $27,101.49 payment to Herrera and $93 in court costs associated with Polk County Lawsuit I. Defendants then filed the motions at bar.

## STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 631.

## DISCUSSION

Defendants argue that summary judgment is warranted because plaintiff cannot establish the requisite claim elements. Specifically, Churchill contends that plaintiff's FDCPA claim fails as a matter of law because it is not a debt collector. Churchill's Mot. Summ. J. 14-20 (doc. 73). Similarly, Churchill maintains that plaintiff's UTPA claim fails as a matter of law because plaintiff has not identified any subsection applicable in this context. Id. at 24-27. In addition, defendants assert plaintiff cannot establish any ulterior motive or bad intent in regard to the erroneous payoff amount, eliminating his claims for abuse of process and fraud. Herrera's Mot. Summ. J. 16-26 (doc. 68). Herrera argues that he owed no special duty to plaintiff, such that plaintiff cannot maintain a tortious good faith and fair dealing claim. Id. at 26-27. Finally, defendants assert the requested damages are not recoverable because plaintiff's own material breaches under the Agreement caused his loss of the Property. Id. at 27-31.

Plaintiff opposes defendants' motions on the grounds that his claims are generally "cognizable" but fails to meaningfully address myriad specific arguments regarding the claims and evidentiary deficiencies raised therein. See generally Pl.'s Resp. to Herrera's Mot. Summ. J. (doc. 75).

## I.    Preliminary Matters

The Court must resolve two issues before reaching the substantive merits of defendants' motions. First, plaintiff raises new facts and legal theories in his oppositions. It is well-established

that "summary judgment is not a procedural second chance to flesh out inadequate pleadings."
Wasco Prods., Inc., v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) (citation and
internal quotations omitted); see also Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1080
(9th Cir. 2008) (where "the complaint does not include the necessary factual allegations to state a
claim, raising such claim in a summary judgment motion is insufficient to present the claim to the
district court"); Justice v. Rockwell Collins Inc., 117 F.Supp.3d 1119, 1134 (D. Or. 2015), aff'd,
720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party
makes . . . the court may treat that argument as conceded") (citation and internal quotations and
brackets omitted). Accordingly, to the extent they rely on un-plead facts and theories, plaintiff's
briefs "are immaterial to the issues presently before the Court." Nemeth v. Ellena, 2015 WL
2375982, *4 (D. Or. May 18, 2015).

Second, beyond plaintiff's bare allegations and conjecture, the record does not contain any
evidence to support critical aspects of each of claim. In fact, plaintiff's oppositions do not refer to
any evidence, except for the documents attached to the complaint and, in one instance, an email
regarding the scheduling of a hearing in one of the Polk County actions. See, e.g., Pl.'s Resp. to
Herrera's Mot. Summ. J. Ex. A (doc. 75). This is problematic given that, in many instances,
defendants' evidence blatantly contradicts plaintiff's bare allegations. See, e.g., First Foster Decl.
¶¶ 2-14 (doc. 69). Moreover, as denoted above, plaintiff acknowledges he was in default under the
Agreement for failure to remedy code violations and timely tender all requisite payments; he also
does not argue that he could have cured his defaults with additional time or that he had the ability
to pay the actual amount owed as of December 2017.

In light of these circumstances, plaintiff's mere allegations of wrongdoing are insufficient
to create a genuine issue of material fact. See Celotex, 477 U.S. at 322 (summary judgment should

be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial"); see also Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment") (citation omitted). On this basis alone, defendants are entitled to summary judgment. Due to plaintiff's pro se status, the Court will nonetheless address each of plaintiff's five claims in turn.

## II. FDCPA Claim

Plaintiff's FDCPA claim relies on 15 U.S.C. § 1692e, which provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." FAC ¶¶ 34-43 (doc. 9). A debt collector is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts or who regularly collects or attempts to collect, directly or indirectly, debts owed or due another." 15 U.S.C. § 1692a(6).

The plaintiff "bears the burden of proving the defendant's debt collector status." Andexler v. Clarke, 2011 WL 2470301, *2 (D. Or. June 20, 2011) (citation and internal quotations omitted). To meet this burden, the plaintiff must show the defendant's "principal business" was collecting consumer debts or that it "regularly" collected or attempted to collect such debts. Id.; see also Schroyer v. Frankel, 197 F.3d 1170, 1176 (6th Cir. 1999) (law firm is not a debt collector under the FDCPA unless its activities "approximate that of a traditional debt collection agency").

Churchill has put forth undisputed evidence that its primary focus is "agricultural liens, commercial farm leases, guardianship proceedings, probate administration, business to business transactions, business formation, and commercial real estate transactions." First Foster Decl. ¶ 2

(doc. 69). In other words, Churchill's "principal business in not the collection of debts from consumers." Id.; see also Andexler, 2011 WL 2470301 at *2 (attorney's practice was not mainly for collecting consumer debts where he only occasionally handled such matters).

As such, the question becomes whether Churchill "regularly" collects or attempts to collect consumer debts. Given the lack of relevant Ninth Circuit precedent, this District has looked to the factors as articulated in Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56 (2d Cir. 2004), in determining whether a law firm is a "debt collector." See, e.g., Andexler, 2011 WL 2470301 at *2-4; Duke v. Nachtigal, 2012 WL 195466, *4-5 (D. Or. Jan. 19, 2012); Hingston v. Quick Collect, Inc., 2016 WL 4059158, *3-4 (D. Or. July 28, 2016). These factors are "illustrative rather than exclusive" and include, among others, the absolute number of debt collection communications issued over the relevant period, the frequency of such communications, any discernable patterns of debt collection, whether the law firm has specific personnel assigned to work on debt collection activity, whether the activity is undertaken in connection with ongoing client relationships with entities that have retained the lawyer to assist in the collection of consumer debts, and whether the firm advertises its services for debt collection. Goldstein, 374 F.3d at 62-63.

It is readily apparent from the record before the Court that Churchill does not conduct debt collection activities with adequate regularity to fall within the scope of the FDCPA. From 2016 through the present, Churchill's debt collection activities have, at most, constituted 0.5 percent of its workload and revenues. First Foster Decl. ¶¶ 8-12 (doc. 69). Churchill also has not: had any ongoing relationship with clients who were in the business of collecting debts from consumers, had any personnel specifically assigned to work on collecting debts from consumers, marketed itself as having expertise in collecting debts from consumers, and used form letters, office systems,

or outside contractors to facilitate any work on collecting debts from consumers. Id. at ¶¶ 4-7. All in all, Churchill worked on six matters since January 1, 2016, that entailed debt collection activities as defined by the FDCPA or otherwise "involved providing notices to terminate occupancy to consumers, foreclosure of consumers' security interests, preparation and mailing of notices of forfeiture to consumers, and forcible entry and detainer cases against consumers that involved non-payment of rent." Id. at ¶¶ 8-12. Thus, even broadly defined, Churchill's debt collection activities were a relatively minor and infrequent part of its practice. Churchill's motion is granted as to plaintiff's FDCPA claim.

## III. Abuse of Process Claim

"The elements of abuse of process are: (1) an ulterior purpose, (2) a willful act in the use of process not proper in the regular conduct of the proceeding, (3) injuries beyond those which are a common burden on parties to litigation, and (4) an actual arrest or a seizure of property." D'Ambrosio v. Sterling Sav. Bank, 2013 WL 5744730, *8 (D. Or. Oct. 22, 2013) (citing Clausen v. Carstens, 83 Or.App. 112, 118, 730 P.2d 604 (1986)). Under Oregon law, this tort "involves the use of the process as a club by which to extort something unrelated to the process from the other party." Zweizig v. Nw. Direct Teleservs., Inc., 2017 WL 68627, *7 (D. Or. Jan. 6, 2017) (citation and internal quotations omitted). The plaintiff bears the burden of proof as to each element. Cannon v. Polk Cnty., 68 F.Supp.3d 1267, 1290 (D. Or. 2014), aff'd, 702 Fed.Appx. 527 (9th Cir. 2017).

Here, there is no evidence in the record to establish the existence of the first and second elements. Plaintiff's claim is based on his assertion that defendants initiated the Polk County actions with the ulterior motive of forcing him to pay "the unjustified sum of $27,101.49." FAC ¶¶ 45-50 (doc. 9). Initially, defendants have put forth evidence reflecting that Churchill's incorrect demand amount was generated due to an honest mistake. See First Foster Decl. ¶ 14 (doc. 69)

("[b]ased on a miscommunication with Herrera, Churchill Leonard calculated that the amount Plaintiff owed was approximately $6,000 (one payment) more than he did"); see also Second Foster Decl. ¶ 3 (doc. 79) (Foster stating she "did not know" plaintiff "did not owe $27,101.49 until after [the filing of] the above-captioned lawsuit"). As a result, nothing suggests that defendants intentionally or in bad faith demanded more than was due and owing under the Agreement.

Furthermore, the explicit purpose of both Polk County lawsuits was to evict plaintiff for failure to remedy code violations on the Property and pay the amount owed under the Agreement.[6] FAC Exs. 10, 15-16 (doc. 9); First Herrera Decl. ¶¶ 7-10 (doc. 70). Critically, plaintiff does not dispute that he materially breached the parties' contract as of mid-2017, which, in turn, gave rise to Herrera's right to "declare the entire balance of payments [under the Agreement] immediately due and payable" and "exercise any and all rights and remedies available." FAC Ex. 4 (doc. 9); First Lis Decl. Ex. 1, at 42, 71-72 (doc. 71); First Lis Decl. Ex. 3, at 21 (doc. 71).

Defendants' efforts to obtain outstanding contractual sums was therefore not "unrelated to the process" – it is one of the actual bases for the initiation of the Polk County lawsuits and the relief requested therein. See Dauven v. U.S. Bank Nat. Ass'n, 2010 WL 2640119, *7 (D. Or. June 7), adopted by 2010 WL 2640115 (D. Or. July 1, 2010) (dismissing an abuse of process of claim where there was no indication the defendant "initiated the FED proceeding for any purpose other than . . . to obtain possession of the property," denoting "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions") (citation and internal quotations omitted). Significantly, the Notice of Default and

---

[6] Indeed, at oral argument, plaintiff maintained that defendants' motive in filing the Polk County lawsuits was to "regain possession of the house to avoid conflict with the city." Hearing (Sept. 13, 2019).

Forfeiture was served on plaintiff more than a month before Polk County Lawsuit I was initiated; had plaintiff paid the demand amount in the intervening weeks, or otherwise communicated with Herrera or Foster and disputed the amount owed, there would have been no need to litigate his right to possess the Property.

Plaintiff's claim fails for another reason. The only arrest or seizure of property plaintiff identifies is "$93.00 in court fees paid in defending the case to avoid an automatic eviction, fuel expended to driving to court, paper and ink wasted defending against the opposing party's claim and the $27,101.49 paid by Roller to avoid forfeiture of the property." Pl.'s Resp. to Herrera's Mot. Summ. J. 5 (doc. 75). As for the $93.00 in court fees, and fuel and document costs, plaintiff has not "plead any injuries beyond having to defend the actions." See Benton v. Legacy Health, 2017 WL 4574972, *2 (D. Or. Aug. 11), adopted by 2017 WL 4581797 (D. Or. Oct. 12, 2017) (dismissing an abuse of process claim where the only seizure identified was costs associated with defending the lawsuit at issue). Concerning the $27,101.49, plaintiff voluntarily remitted this sum weeks after his motion for judgment on the pleadings was granted in Polk County Lawsuit I. Defendants' motions are granted as to plaintiff's abuse of process claim.

## IV.    UTPA Claim

To establish a private consumer claim under the UTPA, the plaintiff must allege: "(1) a violation of ORS 646.608(1); (2) causation (as a result of); and (3) damage (ascertainable loss)." Feitler v. Animation Celection, Inc., 170 Or.App. 702, 708, 13 P.3d 1044, 1047 (2000) (citations and internal quotations omitted). Regarding the latter element, the loss "must be a result of the unlawful trade practice. That is, the unlawful trade practice must have caused the ascertainable loss that the plaintiff suffered." Pearson v. Philip Morris, Inc., 358 Or. 88, 117, 361 P.3d 3, 21 (2015).

Plaintiff cites to Or. Rev. Stat. § 646.608(1)(s) as the basis of his UTPA claim against Churchill, which specifies: "A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person . . . Makes false or misleading representations of fact concerning the offering price of, or the person's costs for real estate, goods or services." FAC ¶¶ 51-55 (doc. 9). Plaintiff's claim is fatally flawed in two respects.

First, plaintiff does not identify any actionable false or misleading representation under this subsection. The plain language of subsection (s) makes clear that the representation must be about the defendant's own costs as they relate to the exchange of personal property. Feitler v. Animation Celection, Inc., 170 Or.App. 702, 708-09, 13 P.3d 1044 (2000); see also Mendoza v. Lithia Motors, Inc., 2018 WL 1513650, * 6 (D. Or. Mar. 27, 2018) ("[a]s a general matter, [Or. Rev. Stat. § 646.608(1)(s)] requires transparency around costs passed on to the consumer" in the sale context) Assuming without deciding subsection (s) can be applied pursuant to a vicarious liability or related theory (because Churchill never owned the Property), the misstatement at issue pertained to the amount plaintiff owed under the Agreement, as opposed to Herrera's offering price or costs for real estate.[7] First Lis Decl. Ex. 1, at 142-43 (doc. 71).

Second, plaintiff failed to demonstrate causation and ascertainable loss. While plaintiff identifies his actual damages as the loss of the fair market value of the property ($152,000) and the December 2017 payment ($27,101.49), he does not present any facts to support his conclusion that such harm was caused by defendants. As addressed throughout, plaintiff concedes he

---

[7] For the first time in his opposition, plaintiff asserts that he "had no obligation to pay Herrera property taxes under the terms of the contract." Pl.'s Resp. to Churchill's Mot. Summ. J. 8 (doc. 76). Yet plaintiff expressly acknowledged at his deposition that he was responsible for paying property taxes to Herrera. First Lis Decl. Ex. 1, at 68, 71 (doc. 71); Second Lis Decl. Ex. 1, at 70 (doc. 81). Plaintiff admitted further that, "prior to receiving the 24 hour notice to vacate" in September 2017, he owed Herrera $1,106.36 for the 2016 property taxes, in addition to the remaining $20,000 purchase price balance. First Lis Decl. Ex. 1, at 116-17 (doc. 71).

materially breached the Agreement and this breach pre-dated any of defendants' allegedly wrongful actions. First Lis Decl. Ex. 1, at 42, 71-72 (doc. 71); First Lis Decl. Ex. 3, at 21 (doc. 71). It is further undisputed that, based on the timing of plaintiff's breach, Herrera possessed the right, as of September 14, 2017, to demand immediate payment of the entire balance of the Agreement and/or exercise any available legal remedies. FAC Ex. 4 (doc. 9); First Lis Decl. Ex. 1, at 71-72 (doc. 71). Finally, plaintiff does not contend that he would have satisfied the contract and retained the Property but for defendants' miscalculated demand. In fact, plaintiff testified that he did not have the ability to pay the correct payoff amount (i.e., $21,106.39) as of September 2017 or at any point thereafter. First Lis Decl. Ex. 1, at 97, 120-21 (doc. 71). Churchill's motion is granted as to plaintiff's UTPA claim.

## V.    Fraud Claim

To prevail on a fraud claim, the plaintiff must show by clear and convincing evidence: "1) a material misrepresentation; 2) knowledge that the representation was false; 3) intent that the misrepresentation is relied upon; 4) justifiable reliance on the misrepresentation; and 5) damage as a result of that reliance." Goschie v. JP Morgan Chase Bank, N.A., 2014 WL 6064783, *5 (D. Or. Nov. 7, 2014) (citing Strawn v. Farmers Ins. Co., 350 Or. 336, 352, 258 P.3d 1199 (2011)). Concerning the first three elements, "[t]he requisite intent to mislead consists of a defendant misrepresenting a material fact for the purpose of misleading the other party or with the knowledge he is misleading the other party, or in reckless disregard of the fact he is misleading the other party." U.S. Nat'l Bank v. Fought, 291 Or. 201, 223, 630 P.2d 337 (1981) (citation omitted). "A showing of reckless disregard requires sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth." Goschie, 2014 WL 6064783 at *6 (citations and internal quotations omitted).

Plaintiff fails to present clear and convincing evidence to support the elements of common law fraud. As discussed herein, there is no evidence before the Court of an intentional misrepresentation. Rather, the record establishes that, due to an honest miscommunication with Herrera, Churchill mistakenly calculated the outstanding sum to include an extra annual contribution towards the purchase price. First Foster Decl. ¶ 14 (doc. 69); see also Goschie, 2014 WL 6064783 at *5 ("Oregon courts do not presume fraud when a transaction is equally susceptible to two explanations in which one is consistent with a fraudulent intent and [the] other with good faith and fair dealing") (citing Galego v. Knudsen, 282 Or. 155, 159 n.3, 578 P.2d 769 (1978)).

Moreover, it is questionable whether plaintiff's reliance was justifiable in this case. See Vukanovich v. Kine, 268 Or. App. 623, 634-35, 342 P.3d 1075 (2015) (as modified) ("for reliance to be justifiable, the party claiming reliance must have taken reasonable precautions to safeguard his or her own interests under the particular circumstances of the case") (citations and internal quotations and brackets omitted). Plaintiff knew or should have known the amount owing under the Agreement. He had access to his own bank records, which would reflect any payments to Herrera towards the purchase price. He also acknowledged having public access to the county property tax assessments. First Lis Decl. Ex. 1, at 68 (doc. 71). During his deposition, plaintiff readily calculated the correct amount owing, agreeing that "it's pretty easy." Id. at 116-17.

Despite being served with the Notice of Default and Forfeiture September 2017, plaintiff did not contest the demand amount or otherwise inquire of either Churchill or Herrera regarding how they arrived at that sum until after Polk County Lawsuit I was underway. Id. at 74-77. In fact, the first time either defendant became aware that plaintiff believed he did not owe $27,101.49 was at the TRO hearing in Polk County Lawsuit II on November 27, 2017. Second Foster Decl. ¶ 3 (doc. 79); Second Herrera Decl. ¶ 2 (doc. 80). Plaintiff then paid, without further comment, the

entire sum demanded on December 12, 2017, and did not request any refund until January 2018.[8] Second Foster Decl. ¶ 6 (doc. 79); Second Herrera Decl. ¶ 4 (doc. 80); FAC ¶ 20 (doc. 9); see also Adams v. J.C. Penney Co., Inc., 865 F.Supp. 1454, 1463 (D. Or. 1994) (granting summary judgment based on the plaintiff's failure to show justifiable reliance in an insurance coverage dispute where the plaintiff did not make attempt to obtain a copy of the policy or call to learn the status of her application for coverage). Defendants' motions are granted as to plaintiff's fraud claim.

## VI.    Tortious Breach of Implied Duty of Good Faith and Fair Dealing Claim

"To prove the tort of bad faith and unfair dealing, plaintiffs must show that a special relationship existed between the parties, that the relationship made the injury from breach of this duty foreseeable, and that the defendant breached this duty to plaintiffs' injury." Norwood v. Atl. Richfield Co., 814 F.Supp. 1459, 1467 (D. Or. 1991). "[T]he law implies a tort duty[9] only when that relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf." Bennett v. Farmers Ins. Co. of Or., 332 Or. 138, 162, 26 P.3d 785 (2001) (emphasis added).

---

[8] Defendants claim that plaintiff "has never requested a refund of the difference between the amount stated in the Default Notice and the amount he actually owed for the Property." Second Foster Decl. ¶ 6 (doc. 79); Second Herrera Decl. ¶ 4 (doc. 80). However, plaintiff filed this lawsuit in January 2018 in which he alleged owing only $21,106.39 towards the Property as of September 2017 (which defendants now concede was correct) and seeking monetary damages. This was sufficient to put defendants on notice that plaintiff believed defendants were liable for, and should be disgorged of, the mistaken overpayment. Nevertheless, while precise terms and figures were not discussed, defendants represented to the Court at oral argument that plaintiff was offered a full refund of his overpayment during the settlement process, but declined. Hearing (Sept. 13, 2019).

[9] Plaintiff predominantly relies on cases involving a contractually-based duty of good faith and faith dealing. Pl.'s Resp. to Herrera's Mot. Summ. J. 11-12 (doc. 75). Such a claim is legally distinct from a tortious breach of good faith and fair dealing claim.

The only potential heightened duty implicated in this case relates to the attorney-client relationship. Specifically, plaintiff alleges the existence of a landlord-tenant relationship, a buyer-seller relationship, a plaintiff-defendant relationship, a creditor-debtor relationship, and, for the first time at summary judgment, an attorney-client and fiduciary relationship (premised on Herrera "holding ti[t]le to the property in trust until all payments were made"). Compare Pl.'s Resp. to Herrera's Mot. Summ. J. 12 (doc. 75), with FAC ¶¶ 64-71 (doc. 9).

Given that plaintiff purchased the Property from Herrera in 2013 and successfully sought dismissal of Polk County Lawsuit I due to the lack of a landlord-tenant relationship, he cannot maintain a good faith and fair dealing claim on this basis. See New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001) (party may not take a clearly inconsistent litigation position to gain an advantage). There is likewise no evidence of a creditor-debtor relationship in the case at bar. In any event, such a relationship would not support plaintiff's claim in this context. See Horner v. Plaza Home Mortg., Inc., 2016 WL 3574551, *2 (D. Or. July 1, 2016) ("[g]enerally, creditor-debtor relationships do not trigger fiduciary duties") (citation and internal quotations omitted). A plaintiff-defendant relationship is also inadequate to support the existence of a special duty of care; parties to legal proceedings are necessarily adverse and do not exercise judgment on the other's behalf.

While there is ample evidence of a buyer-seller relationship, the record reflects only that the parties entered into an arm's length business transaction. See Fleshman v. Wells Fargo Bank, N.A., 27 F.Supp.3d 1127, 1132 (D. Or. 2014) (parties to an arm's length transaction do not have a special relationship that gives rise to liability in tort); see also Edmonson v. Thrifty Payless, Inc., 2018 WL 4495466, *3 (D. Or. Sept. 19, 2018) (the buyer-seller relationship is fundamentally different from "the attorney-client or doctor-patient relationship where a professional has a duty

to look out for the best interests of her client"). Indeed, there is no evidence before the Court indicating the presence of a fiduciary or trust relationship between the parties, or otherwise suggesting plaintiff ceded any decision-making authority to Herrera or that Herrera had a duty to act with plaintiff's best interests in mind. See Strader v. Grange Mut. Ins. Co., 179 Or.App. 329, 335, 39 P.3d 903 (2002), rev. denied, 334 Or. 190, 47 P.3d 485 (2002) (affirming summary judgment under analogous circumstances where the "defendant was not, by virtue of its status or role, dedicated to furthering plaintiffs' interests"). This is especially true given plaintiff's concession that he prepared the Agreement on behalf of both parties. First Lis Decl. Ex. 1, at 28 (doc. 71); see also FAC Ex. 4, at 2 (doc. 9) (Agreement specifying "Seller and Buyer hereby agree the Law Offices of Dale M Roller will handle the purchase transaction contemplated between Seller and Buyer").

Thus, as stated above, this leaves only the attorney-client relationship. Given that plaintiff denies representing Herrera in relation to the Property, and was disbarred in August 2017, this duty appears irrelevant for the purposes of this claim. First Lis Decl. Ex. 2 (doc. 71). Even so, it would be plaintiff who owed a special duty to Herrera, not the other way around. Herrera's motion is granted as to plaintiff's tortious breach of the duty of good faith and fair dealing claim.

**CONCLUSION**

For the foregoing reasons, defendants' Motions for Summary Judgement (docs. 68, 73) are GRANTED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 23rd day of September, 2019.

_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge